(No. 27979.—

THE PEOPLE *ex rel.* Victor L. Schlaeger, County Collector, Appellant, *vs.* E. L. Brand, Appellee.

*Opinion filed January 17, 1945—Rehearing denied March 15, 1945.*

THOMAS J. COURTNEY, State's Attorney, WILLIAM J. TUOHY, State's Attorney on rehearing, and BARNET HODES, Corporation Counsel, (JOSEPH F. GROSSMAN, OTTO S. FASIG, EMMETT HARRINGTON, and J. HERZL SEGAL, of counsel,) all of Chicago, for appellant.

ROBERT N. HOLT, and ADELBERT BROWN, both of Chicago, for appellee.

Mr. JUSTICE MURPHY delivered the opinion of the court:

Objector paid a part of his real estate taxes levied for the year 1940 under protest, and when the county treasurer and *ex-officio* county collector of Cook county made application to the county court of said county for judgment and · order for sale for delinquent taxes, he filed objections to the items included in the protest. Certain objections were sustained and this appeal followed, presenting questions on two items relating to the corporate purpose fund of the city of Chicago, three items pertaining to the water fund of said city, and one item in its vehicle tax fund.

In the appropriation ordinance adopted in January, 1940, fixing estimates of current assets and liabilities as of January 1, there was included an item of liability in the corporate purpose fund account for "reimbursement to undistributed taxes $894,898.48." This was to provide for a levy to repay a loan made from the undistributed tax fund to the corporate purpose fund, which loan had been purportedly authorized by an ordinance of June 10, 1938. This identical item was included in the appropriation and levy ordinances of the city for the preceding year. Objections were filed and the validity of such item was considered in *People ex rel. Toman* v. *Baltimore & Ohio & Chicago Railroad Co.* 381 Ill. 585. The objection was sustained and that case is controlling here as to the item in the 1940 ordinances unless the verbal testimony in the record in this case, but absent in the former, furnishes a basis for making a distinction between the two cases.

In the former case, no information was given as to the purpose for which the tax was levied. The verbal testimony in this case indicates it was levied for the working cash fund under circumstances to be related. In the former case it was observed that the ordinance contained a recital that the delay in distributing the money then in the undistributed tax fund to the several funds for which they were levied was occasioned by the "confusion that has arisen due to the objections to the tax levies" and that it was "held in reserve until the fund or funds to which the said taxes are to be finally distributed can be ascertained from the final report of the county collector." It was noted that the concluding section of the ordinance provided "When the said proper final distribution shall have been determined, the amount levied and collected for purposes other than the General Corporate Purpose Fund shall be repaid to the respective funds to which they belong." In considering these provisions in connection with the requirements of section 2a of article VII of the Cities and Villages Act, (Ill. Rev. Stat. 1939, chap. 24, par. 102,) as to the facts necessary to the making of the annual appropriation ordinance, it was said: "If the tax money in the undistributed tax fund was earmarked for the purposes for which it was levied, it is evident that it would have to be listed as an asset of the fund representative of the purpose for which it was levied, and against this asset would be the liabilities of such fund. If it be considered as an asset of the undistributed tax fund, then the liabilities of the fund for which it was levied are not included in the appropriation ordinance. If there are no further existing liabilities of the purpose for which it was levied, then it is surplus and readily distributable to other funds but not in the form of a loan from one fund to another." The objection was sustained on the theory that the facts before the court showed that the undistributed tax fund was but an accumulation of money levied in the first instance for a particular fund representative of

a particular purpose and, that being so, it should have been reflected in the fund for which it was levied.

At the hearing in the instant case, the city offered the testimony of its chief clerk in the city comptroller's office. He testified to his familiarity with the item as it appeared in the 1940 appropriation ordinance and gave an explanaton of the source and purpose for which the levy was made. It now appears that the item of $894,898.48 was an accumulation of taxes levied in 1930, 1931 and 1932 for the working cash fund, the creating of such fund being authorized by an act of the General Assembly adopted in 1930. The act authorized the establishment of the fund by the sale of bonds or by tax levy. The city issued $12,000,000 worth of bonds, the maximum allowed by the statute for that purpose, and placed the proceeds of such bonds in the working cash fund. In addition it levied a tax in 1930 for the same purpose. Objection was filed to such levy and, in *People ex rel. McDonough* v. *Mills Novelty Co.* 357 Ill. 285, it was held that the city had authority to provide funds for the working cash fund by the sale of bonds or by levy, but that it could not pursue both, and that inasmuch as it had already sold the bonds in the maximum amount permitted by statute, it had exhausted its powers in that behalf. The levy was held to be illegal. The decision in the *Mills Novelty case* became final in October, 1934, but in the meantime the city had adopted the same procedure in its appropriations and levies for 1931 and 1932. Notwithstanding such a levy was held illegal in the *Mills Novelty case,* many taxpayers waived their right to object and paid the illegal tax in full without protest. The item of $894,898.48 is the accumulation of such payments collected by virtue of the illegal levies for the three years named.

Objector contends the evidence of the chief clerk was not admissible and that to admit it and give it the weight the city contends it should receive would have the effect of changing the item objected to from an appropriation for

the "reimbursement of the undistributed tax fund" to an appropriation to repay a loan made from the working cash fund to the corporate purpose fund. We shall not stop to consider the propriety of such objection for if the evidence is given its greatest force it does not aid the city's position in making the levy. In the *Mills Novelty case,* the various provisions of the act authorizing the establishment of a working cash fund were considered as to meaning and legislative intent. It was said that the legislature intended that the money in the working cash fund could not be regarded as current assets available for appropriation and should not be appropriated by the city council in the annual appropriation bill. That its use was to provide money with which to meet ordinary and necessary disbursements for salaries and other corporate purposes; that the fund could be transferred in whole or in part to the general corporate fund of the city and disbursed therefrom in anticipation of the collection of taxes lawfully levied for general corporate purposes. It was said: "Moneys so transferred to the general corporate fund shall be deemed to have been transferred in anticipation of the collection of that part of the taxes so levied which is in excess of the amount or amounts thereof required to pay any warrants, with interest thereon, theretofore and thereafter issued, and such taxes levied for general corporate purposes, when collected, shall be applied first to the payment of such warrants and the interest thereon and then to the reimbursement of the working cash fund. * * * It is apparent that the purpose of the act is that this fund shall always constitute a working cash fund and shall never become impaired; that as advancements are made from time to time to other funds such funds shall pay back to the working cash fund any such funds advanced by the working cash fund."

The holding in the *Mills Novelty case* was that when the city had sold $12,000,000 of bonds and placed the proceeds in the working cash fund it had established the fund

and had no authority to levy a tax for the purpose of increasing the fund beyond the amount derived from the sale of the bonds. The city contends that since the sum of $894,898.48 was derived from a levy made for the working cash fund it may carry it in an undistributed tax fund and loan it to the corporate purpose fund. Such procedure, if approved, would have the effect of making the money in the undistributed tax fund function the same as though it was in the working cash fund. Such would be contrary to the terms of the statute authorizing the working cash fund and would be opposed to the holding in the *Mills Novelty case.*

The city's contention that it has the authority generally to loan money in one fund to another fund finds support in the law, but the facts urged here make that principle inapplicable. That principle is on the theory that a levy has been made for a particular purpose and the money derived therefrom goes into a fund representative of such purpose and that the fund does not have immediate use for some of the money so the theory is evolved that such fund loans its money to another fund that needs money to meet its immediate needs and that it will be repaid. Such theory includes the principle that the money loaned is earmarked for a particular purpose and is to be returned to the original fund to be used for such purpose. As was said in *People* v. *Baltimore & Ohio & Chicago Railroad Co.* 381 Ill. 585, if the money in the undistributed tax fund is earmarked for a particular fund, then it is an asset of that fund. The fund in question was derived from an illegal levy and cannot be used for the purpose for which it was levied. It belongs either to the person who paid it, or if his rights are extinguished, it goes to the corporate purpose fund. The answer to such question is not within the scope of the issue in this case, for the reason that the city is seeking to sustain the levy on the theory that it has the authority to continue to hold the money in an undistributed

tax fund for loan purposes. It is obvious that, when considered in the light of the verbal testimony and the lapse of time since the ordinance of June 10, 1938, was passed, some of the statements in the ordinance as to why the money was carried in the undistributed tax fund have lost their persuasiveness. The judgment of the county court sustaining the objection was correct.

In 1939, the city levied $37,000,000 for its corporate purpose fund. It allowed 10 per cent, or $3,700,000, for loss and cost of collection. In the appropriation ordinance for 1940, the city estimated the net value of the taxes receivable in 1940 from the 1939 levy and deducted anticipation warrants and interest thereon plus a deduction for loss and cost of collection in the sum of $5,550,000, thus increasing the loss and cost item to 15 per cent of the original levy. It is the increase in the loss and cost item that is questioned by the objector. He alleges that such increase, $1,850,000, is illegal, and that therefore the 1940 levy was excessive in that amount. The rate produced by including such amount as extended against objector's property produces a rate of $.092693. It is alleged in the objection that no facts transpired or any actions took place in relation to the 1939 tax levy between the date of its adoption in January, 1939, and the passage of the appropriation ordinance in January, 1940, that would show the 1939 deduction of $3,700,000 was inadequate to meet the depreciation caused by loss and cost of collection.

A statement identified as "Summary D, estimate of net taxes receivable" in the appropriation ordinance of January, 1940, contained the total taxes extended for the corporate purpose fund for each of the years 1935-1939, both inclusive, and the deductions therefrom, which included the cash that had been received from each yearly levy, the tax warrants unpaid, interest thereon and the loss and cost of collection. The statement shows that of the 1939 levy of $37,000,000 nothing had been received in cash

as of January 1, 1940. The tax warrants and interest thereon standing against the levy totaled $27,783,637, this with the loss and cost item of $5,550,000, totaled $33,333,-637, thus leaving a net tax receivable in 1940 from the 1939 levy of $3,666,363. No evidence was introduced by the objector to support the allegation in his objection that nothing had transpired to support the increase of $1,850,000 in the loss and cost item.

Whether the city had the right to increase the loss and cost item in the manner stated is dependent upon the language of the statute under which the appropriation ordinance was drawn and the conclusions that may be drawn from the "Summary D" statement. Section 2a of article VII of the Cities and Villages Act (Ill. Rev. Stat. 1939, chap. 24, par. 102,) provides that estimates of taxes to be received from the levies of prior years shall be net after deducting amounts estimated to be sufficient to cover the loss and cost of collecting such taxes, which shall include uncollectible taxes, the cost of collecting taxes, the amounts of such taxes for the nonpayment of which real estate shall be forfeited, abatements, tax anticipation warrants outstanding with interest sufficient to pay all that accrues until the warrants are redeemed. The statute requires the city council to appropriate sums sufficient to defray all necessary expenses and liabilities of the city to be paid or incurred during the fiscal year. To determine the amount necessary to be raised by taxation, the statute requires estimates of certain assets, thus including what the tax levying body considers will be available during the year from taxes levied for prior years. If, in a prior year, the city council has estimated that a certain amount should be deducted as loss and cost of collections from a particular levy, there is nothing in the statute that prevents the council in the next or succeeding years from fixing a different estimate of loss and cost for that levy, if the facts and circumstances warrant such change. On the face of the statute, the city council

had the right in January, 1940, to fix anew the amount that would be received to the corporate purpose fund from the 1939 levy and, if it concluded that conditions warranted an increase of the loss and cost item over what it had been fixed for the preceding year, it had the right to do so. The fixing of the estimate includes a consideration of all the factors that would affect the collection of the tax levied for the prior year, taking into consideration the experience gained in collecting such taxes. In the absence of a showing to the contrary, it will be presumed that the tax-levying body found sufficient facts to warrant the increase. The burden was upon the objector to overcome such presumption, and this he has not done. In fact, the contents of "Summary D" sustain the increase. It shows that as of January 1, 1940, only 74.69 per cent of the 1935 levy had been collected; 81.22 per cent of the 1936 levy; 77.56 per cent of the 1937 levy and 77.95 per cent of the 1938 levy.

Each estimate of loss and cost of collecting any levy of a prior year is dependent upon the facts of each case. We cannot adopt a certain fixed percentage as the maximum or prescribe any formula for a tax-levying body to follow. The deduction in this case was 15 per cent of the total levy. In *People ex rel. Nash* v. *Northwestern Mutual Life Ins. Co.* 361 Ill. 248, we held that 4.63 per cent was all that could be allowed. In *People ex rel. Gill* v. *Diversey Hotel Corp.*, 364 Ill. 298, 12 per cent was held not to be excessive and in *People ex rel. Gill* v. *Schweitzer,* 366 Ill. 568, a 10 per cent deduction was sustained. In the absence of proof showing 15 per cent in this instance was excessive it will be sustained. The court erred in sustaining the objection to this item.

The next objection is to the appropriation ordinance of January, 1940, in matters which relate to the water fund, water works general fund, water works filtration fund and the vehicle tax fund. The ordinance fixes the amount of estimated resources and liabilities and the amounts appro-

priated for each fund, but we need consider only the totals of all the funds. The total estimated resources of the four funds was fixed at $34,379,415.44, and total appropriations were $34,227,319.04, thus making the estimated resources exceed the appropriations by $152,096.40. Objector contends that the estimates and appropriations of these special funds should be·reflected in the corporate fund. If allowed, it would result in the resources exceeding the appropriations by $152,096.40, thereby producing an illegal tax for said amount. This question involves a consideration of certain provisions of the city charter of the city of Chicago, under which the city's water system was authorized, and the Cities and Villages Act, under which the city is presently organized.

The water system for the city of Chicago was first authorized by chapter XV (Chicago Water Works) of an act entitled, "An Act to reduce the charter of the City of Chicago and the several acts amendatory thereof into one act and to revise the same." Approved February 13, 1863. (Private Laws of 1863, page 40 *et seq.*) Sections 13 and 32 of chapter XV related to water rentals and revenues of the water system. They were as follows:

"Sec. 13. All funds derived from the sale of said water loan bonds, or from water rents, or otherwise, for the water works of the city, shall be exclusively used and appropriated by said board to the objects and purposes pertaining to the water supply of said city herein specified; nor shall the same, or any part thereof, be used by said board or by said city for any other purpose.

"Sec. 32. All accounts pertaining to the water works of said city shall be kept separate and distinct from the accounts pertaining to other departments of said board, and all moneys deposited with the city treasurer on account of the water works shall be by him kept separate and distinct from all other moneys as the water fund, and shall only be applied for the use and purposes for which the same were received; and such moneys shall be held by the

treasurer of the city as a special fund, separate and distinct from all other funds, and he shall be deemed guilty of embezzlement if he shall pay out such moneys for any account other than that belonging to such water fund, and shall be liable to indictment for so doing."

Pursuant to an election held April 23, 1875, the city of Chicago became incorporated under the general Cities and Villages Act of April 10, 1872. Section 6 of article I of the general Cities and Villages Act provides, in reference to cities or villages organized under prior acts, that after a city or village has become organized under the general act in the manner therein provided, the provisions of the general act shall be applicable to such city or village and all laws in conflict therewith shall no longer be in effect. Section 6 further provides "But all laws or parts of laws not inconsistent with the provisions of this act shall continue in force and applicable to any such city or village the same as if such change of organization had not taken place." (Rev. Stat. 1874, chap. 24, par. 6.) The effect given such provision is that a city organizing under the general act thereby substitutes the provision of the general act for the former law insofar as the two acts are inconsistent. (*Bullis* v. *City of Chicago,* 235 Ill. 472.) Some of the cases, where questions involving the two acts are considered, are *Cleveland, Cincinnati, Chicago and St. Louis Railway Co.* v. *Randle,* 183 Ill. 364; *Board of Water Comrs.* v. *People ex rel. City of Springfield,* 137 Ill. 660; *Covington* v. *City of East St. Louis,* 78 Ill. 548.

In *People ex rel. City of Chicago* v. *Hummel,* 215 Ill 71, the question raised in a *mandamus* action was whether the city treasurer of the city of Chicago could be commanded to comply with an ordinance which directed him to transfer $650,000, derived from water rentals and other sources of the city water system, from the water fund to the corporate fund. It was held that there was nothing in

the general Cities and Villages Act which operated as a repeal of sections 13 and 32 of the Private Laws of 1863 above quoted.

The section of the Cities and Villages Act which objector contends is inconsistent with sections 13 and 32 of the special act, and which, it is urged, nullifies them is section 2a of article VII, (Ill. Rev. Stat. 1939, chap. 24, par. 102,) generally referred to as the City Budget Act. It is well settled that organization under the general act includes the amendatory provisions thereof, (*Guild* v. *City of Chicago,* 82 Ill. 472,) and the application of this principle would make the City Budget Act controlling in the city even though it did not become a part of the general Cities and Villages Act in its present form until 1939.

Reference is made to the requirements of the City Budget Act wherein it directs that the annual appropriation ordinance shall set forth estimates of all current assets "of each fund" available for appropriation in such fiscal year and that there shall be detailed estimates of taxes to be levied and of "all other current revenues to be derived from sources other than such taxes." It is contended that these requirements, with other provisions of the budget law, indicate a legislative intent to require a balanced budget as to all funds, and if there is an excess of resources over appropriations in a special fund, it is an appropriable asset which reduces the levy for the corporate fund in the amount of such excess.

The City Budget Act will not bear such construction. It is well established that funds which have a source of income other than from taxes, such as comes from the city's ownership and operation of a water works system or an electric plant, often have special burdens that cannot be imposed upon other funds. There are many cases where the city has created an indebtedness to construct or extend water systems or electric plants, and the statute directs that

the payment of the indebtedness shall be a lien upon the revenues derived from the operation of such utility. Other funds may be created to receive revenues collected from some special source. The vehicle tax fund involved in this objection is an apt illustration. Section 96 of article V of the Cities and Villages Act (Ill. Rev. Stat. 1939, chap. 24, par. 65.95,) vests in cities the power to direct, license and control wagons and other vehicles conveying loads within the city and to charge a license fee therefor. The act provides that such fees may be appropriated for the establishment and maintenance of automobile inspection stations, and that the balance in cities with a population of over 40,000 shall be used for street improvement. It will be observed that the statute which authorizes the collection of the license fee also directs the purpose for which it can be expended and the city council has no authority to divert it to another purpose.

In the *Hummel case,* it was said: "A repeal of an enactment because of a repugnancy in a later statute is not favored, and only results when the two statutes are wholly irreconcilable, and the later act will not operate as a repeal if by any reasonable construction the two enactments may be harmonized." We believe the City Budget Act and sections 13 and 32 of the Chicago Water Works chapter of the Private Laws of 1863 may be harmonized. The court erred in sustaining this objection.

For the reasons assigned, the judgment of the county court is reversed and the cause remanded with directions to proceed in accordance with the views expressed.

*Affirmed in part and reversed in part*
*and remanded, with directions.*